FILED
CLERK, U.S. DISTRICT COURT

2/19/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: \_\_\_\_\_ JB \_\_\_\_\_ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2020 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>TASSILO HEINRICH,<br>  aka "Tass,"<br>  aka "BigBoy,"<br>  aka "BigBoy#1828,"<br>  aka "Pokeball,"<br><br>    Defendant. | CR   8:21-cr-00022-JLS<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1349: Conspiracy to Commit Wire Fraud; 18 U.S.C. § 1028A(a)(1): Aggravated Identity Theft; 18 U.S.C. §§ 981(a)(1)(C), 982, 1028 and 28 U.S.C. §2461(c): Criminal Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 1349]

A.    INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

1.    Defendant TASSILO HEINRICH, also known as "Tass," "BigBoy," "BigBoy#1828," and "Pokeball" ("HEINRICH"), resided in Orange County, within the Central District of California.

2. The Victim Company was an e-commerce platform for online stores that offered services to online merchants, including payments, marketing, shipping, and customer engagement tools.

3. Un-indicted Co-Conspirator 1 ("UCC1") was a Philippines-based employee of a third-party contractor who provided customer support services for the Victim Company.

4. UCC1 was authorized to access certain portions of the Victim Company's internal network solely for the purpose of performing customer service work for the Victim Company; UCC1 was not authorized to access any portions of the Victim Company's internal network for any other purpose.

5. Un-indicted Co-Conspirator 2 ("UCC2") resided in Portugal.

B. OBJECTS OF THE CONSPIRACY

Beginning on a date unknown and continuing until on or about January 27, 2021, in Orange County and Los Angeles County, within the Central District of California, and elsewhere, defendant HEINRICH knowingly conspired with others known and unknown to the Grand Jury to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

C. MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

The object of the conspiracy was to be accomplished, in substance, as follows:

1. UCC1 would fraudulently gain access to data relating to merchants who used the services offered by the Victim Company, as well as to customers of those merchants, without authorization.

2. UCC1 would steal the merchant and customer data from the Victim Company's internal network by either taking screenshots of the

data or uploading the data to Google Drive; the stolen data would include, without limitation, merchants' and customers' names, customers' billing and shipping addresses, customers' email addresses, items the customers purchased from the merchants, and customers' payment methods.

3. UCC1 would transmit the stolen data to defendant HEINRICH and UCC2.

4. In exchange for the stolen data, defendant HEINRICH and UCC2 would either pay UCC1 or provide UCC1 false positive reviews by impersonating merchants to whom UCC1 had provided customer service, but who had not given UCC1 a review.

5. Defendant HEINRICH and UCC2 would use the stolen data for their personal benefit, including (a) by setting up merchant pages that were similar to the pages of the real merchants whose data had been stolen in order to take business away from those merchants, and (b) by selling the data to other co-conspirators who would use the data to commit fraud against the merchants and their customers.

D.  OVERT ACTS

In furtherance of the conspiracy and to accomplish its object, on or about the following dates, defendant HEINRICH and others known and unknown to the Grand Jury committed various overt acts in Orange County and Los Angeles County, within the Central District of California, and elsewhere, including, but not limited to, the following:

1. On or about May 14, 2019, via e-mail, defendant HEINRICH told UCC1 to add defendant HEINRICH as a "friend" on an online communications platform.

2. On or about May 15, 2019, via online messages, defendant HEINRICH told UCC1 that defendant HEINRICH could give UCC1 many false positive reviews and payment if UCC1 could help defendant HEINRICH with some things, and asked UCC1 what powers UCC1 had through his employment; UCC1 replied that there were a lot of things UCC1 could do for defendant HEINRICH.

3. On or about May 15, 2019, via online messages, defendant HEINRICH asked UCC1 if UCC1 could obtain information on merchants who used the Victim Company's services and export data related to those merchants, to which UCC1 replied that he could.

4. On or about May 15, 2019, via online messages, defendant HEINRICH told UCC1 that defendant HEINRICH and UCC1 would make a lot of money as long as UCC1 did not get caught.

5. On or about May 17, 2019, via online messages, defendant HEINRICH asked UCC1 to send defendant HEINRICH data relating to a merchant who used the Victim Company's services, and said that defendant HEINRICH would pay UCC1 $100 via PayPal or cryptocurrency in exchange.

6. On or about May 19, 2019, via online messages, defendant HEINRICH told UCC1 that defendant HEINRICH would communicate with UCC1 on behalf of UCC2 from then on.

7. On or about May 19, 2019, via online messages, defendant HEINRICH asked UCC1 for sales data relating to a merchant who used the Victim Company's services, and said that defendant HEINRICH would pay UCC1 $400 in exchange; UCC1 agreed.

8. On or about May 20, 2019, via online messages, defendant HEINRICH asked UCC1 how much payment UCC1 wanted for data related to merchants who used the Victim Company's services; UCC1 responded that

4

1 he would accept $150 for one type of file and $180 for a different
2 type of file.
3     9.   On or about May 20, 2019, via online messages, defendant
4 HEINRICH told UCC1 that UCC2 would give UCC1 good false positive
5 reviews; UCC1 replied that one false positive review a day would be
6 sufficient.
7     10.   On or about May 20, 2019, via online messages, defendant
8 HEINRICH told UCC1 that defendant HEINRICH and UCC2 wanted to do a
9 lot of business with UCC1.
10     11.   Between on or about May 20, 2019 and on or about September
11 15, 2020, UCC1 accessed without authorization data for merchants who
12 used the Victim Company's services.
13     12.   On or about May 24, 2019, via online messages, UCC1
14 explained to defendant HEINRICH that exporting data from certain
15 merchants who used the Victim Company's services was risky because
16 UCC1 had to force the data to be exported, which could be traced;
17 defendant HEINRICH suggested that UCC1 use a friend's account to
18 export the data instead.
19     13.   On or about May 27, 2019, via online messages, UCC1 asked
20 defendant HEINRICH and UCC2 to give UCC1 three false positive
21 reviews.
22     14.   On or about May 29, 2019, via online messages, defendant
23 HEINRICH told UCC1 to ask UCC2 for additional false positive reviews,
24 and requested data relating to a merchant who used the Victim
25 Company's services.
26     15.   On or about May 29, 2019, via online messages, defendant
27 HEINRICH asked if UCC1 could send screenshots of data relating to
28 merchants who used the Victim Company's services or if that was too

risky; UCC1 replied that he could not at that moment because his management was present, in response to which defendant HEINRICH told UCC1 not to get caught.

16. On or about May 30, 2019, via online messages, defendant HEINRICH told UCC1 that defendant HEINRICH would pay UCC1 on Friday; UCC1 replied that he would start uploading the requested data onto Google Drive.

17. On or about June 3, 2019, via online messages, UCC1 told defendant HEINRICH and UCC2 that UCC1 was working on defendant HEINRICH's request for 365 days of data for merchants who used the Victim Company's services.

18. On or about June 6, 2019, via online messages, UCC1 told defendant HEINRICH and UCC2 that his company's IT staff checked his work computer, but told them not to worry because UCC1 cleared his browser history every day.

19. On or about June 11, 2019, via online messages, defendant HEINRICH asked UCC1 if UCC1 knew anyone else who could provide to defendant HEINRICH data related to merchants who used the Victim Company's services in the event that something happened to UCC1.

20. On or about June 11, 2019, via online messages, defendant HEINRICH said that he hoped UCC2 used a different Virtual Private Network ("VPN") every time UCC2 submitted a false positive review for UCC1.

21. On or about June 11, 2019, via online messages, UCC1 told defendant HEINRICH and UCC2 that UCC1 was being investigated for fraud due to the false positive reviews he received from UCC2, and assured defendant HEINRICH and UCC2 that he denied knowing about or having anything to do with the false positive reviews.

22. On or about July 17, 2019, via online messages, defendant HEINRICH told UCC2 to use a VPN when giving UCC1 a false positive review, and UCC2 replied that he used an Internet Protocol ("IP") address from Mexico.

23. On or about September 4, 2019, via online messages, defendant HEINRICH asked UCC1 to download all sales data for a merchant who used the Victim Company's services; UCC1 agreed to do so and asked defendant HEINRICH for a false positive review in exchange.

24. On or about September 7, 2019, via online messages, UCC1 sent defendant HEINRICH a Google Drive link to stolen data relating to a merchant who used the Victim Company's services.

25. On or about September 7, 2019, via online messages, defendant HEINRICH asked UCC1 to send defendant HEINRICH UCC1's cryptocurrency address so that defendant HEINRICH could pay UCC1 $150 in exchange for stolen data relating to a merchant who used the Victim Company's services.

26. On or about October 17, 2019, via online messages, defendant HEINRICH asked UCC1 for data relating to a merchant who used the Victim Company's services.

27. On or about October 17, 2019, via online messages, UCC1 sent defendant HEINRICH two Google Drive links to stolen data relating to a merchant who used the Victim Company's services, and told defendant HEINRICH to send payment via cryptocurrency in exchange, to which defendant HEINRICH agreed.

28. On or about October 23, 2019, via online messages, UCC1 told defendant HEINRICH that his new location was risky because his managers could see what he was doing on his computer screen.

29. On or about November 14, 2019, via online messages, defendant HEINRICH asked UCC1 for data relating to a merchant who used the Victim Company's services.

30. On or about November 15, 2019, via online messages, UCC1 sent defendant HEINRICH a Google Drive link to stolen data relating to a merchant who used the Victim Company's services.

31. On or about December 4, 2019, via online messages, UCC1 sent defendant HEINRICH two Google Drive links to stolen data relating to merchants who used the Victim Company's services, along with UCC1's cryptocurrency address so that defendant HEINRICH could send payment in exchange.

32. On or about December 10, 2019, via online messages, UCC1 sent defendant HEINRICH a Google Drive link to stolen data relating to a merchant who used the Victim Company's services, told defendant HEINRICH that defendant HEINRICH owed UCC1 $330 in exchange, and asked defendant HEINRICH to send payment by December 14.

33. On or about February 5, 2020, via online messages, defendant HEINRICH asked UCC1 to send data relating to a merchant who used the Victim Company's services, and promised to send UCC1 payment via cryptocurrency the following day.

34. On or about February 5, 2020, via online messages, UCC1 sent defendant HEINRICH a Google Drive link to stolen data relating to a merchant who used the Victim Company's services.

35. On or about February 23, 2020, via online messages, defendant HEINRICH and UCC1 discussed ways in which UCC1 could take screenshots of data relating to merchants who used the Victim Company's services without getting caught, including by lowering the brightness on UCC1's computer screen or using different software.

36. On or about March 9, 2020, via online messages, defendant HEINRICH asked UCC1 to send data for the past 365 days relating to a merchant who used the Victim Company's services.

37. On or about March 10, 2020, via online messages, UCC1 sent defendant HEINRICH a Google Drive link to stolen data relating to a merchant who used the Victim Company's services, and asked defendant HEINRICH for a false positive review in exchange.

38. On or about March 28, 2020, defendant HEINRICH paid UCC1 the equivalent of approximately $20.92 in cryptocurrency.

39. On or about April 2, 2020, via online messages, UCC1 sent defendant HEINRICH a Google Drive link to stolen data relating to a merchant who used the Victim Company's services.

40. On or about April 3, 2020, via online messages, UCC1 sent defendant HEINRICH two Google Drive links to stolen data relating to a merchant who used the Victim Company's services.

41. On or about April 3, 2020, via online messages, defendant HEINRICH told UCC1 that he sent UCC1 $300 via cryptocurrency in exchange for stolen data relating to a merchant who used the Victim Company's services.

42. On or about April 6, 2020, defendant HEINRICH paid UCC1 the equivalent of approximately $152.89 in cryptocurrency.

43. On or about April 11, 2020, via online messages, defendant HEINRICH asked UCC1 for data relating to five merchants who used the Victim Company's services.

44. On or about April 11, 2020, via online messages, UCC1 reminded defendant HEINRICH that he had previously requested data for three other merchants, which was still pending, and defendant

HEINRICH replied that he would pay UCC1 for whatever data UCC1 could get.

45. On or about April 19, 2020, via online messages, defendant HEINRICH asked UCC1 for data relating to four merchants who used the Victim Company's services, and promised to send $500 in exchange.

46. On or about April 19, 2020, via online messages, UCC1 sent defendant HEINRICH four Google Drive links to stolen data relating to four merchants who used the Victim Company's services.

47. On or about April 19, 2020, defendant HEINRICH paid UCC1 the equivalent of approximately $503.57 in cryptocurrency.

48. On or about April 22, 2020, via online messages, UCC1 told defendant HEINRICH that defendant HEINRICH still owed UCC1 $100 for stolen data relating to a merchant who used the Victim Company's services that UCC1 had previously provided to defendant HEINRICH.

49. On or about April 22, 2020, via online messages, defendant HEINRICH asked for UCC1's cryptocurrency address, which UCC1 provided, and defendant HEINRICH confirmed that he sent payment.

50. On or about April 22, 2020, defendant HEINRICH paid UCC1 the equivalent of approximately $103.44 in cryptocurrency.

51. On or about April 22, 2020, via online messages, UCC1 reminded defendant HEINRICH that UCC1 had been accused of fraud due to the false positive reviews he had received from defendant HEINRICH and UCC2, and said that it was a good thing that UCC1 was a good liar.

52. On or about April 25, 2020, UCC2 paid UCC1 the equivalent of approximately $53.73 in cryptocurrency.

53. On or about May 2, 2020, via online messages, UCC1 sent defendant HEINRICH six Google Drive links to stolen data relating to

six merchants who used the Victim Company's services, and said that UCC1 was still waiting for data relating to six additional merchants to finish exporting.

54. On or about May 2, 2020, via online messages, defendant HEINRICH told UCC1 that he paid UCC1 $600 in exchange for the data relating to six merchants who used the Victim Company's services.

55. On or about May 8, 2020, via online messages, defendant HEINRICH asked UCC1 if defendant HEINRICH could remotely access the Victim Company's internal network via UCC1's computer while UCC1 was asleep, to which UCC1 replied that his computer would not permit remote access.

56. On or about June 11, 2020, UCC2 paid UCC1 the equivalent of approximately $21.97 in cryptocurrency.

57. On or about June 13, 2020, UCC2 paid UCC1 the equivalent of approximately $204.71 in cryptocurrency.

58. On or about June 16, 2020, UCC2 paid UCC1 the equivalent of approximately $424.75 in cryptocurrency.

59. On or about June 21, 2020, UCC2 paid UCC1 the equivalent of approximately $244.69 in cryptocurrency.

60. On or about August 26, 2020, via online messages, defendant HEINRICH asked UCC1 to provide sales data for the previous 90 days for three merchants who used the Victim Company's services.

61. On or about August 26, 2020, via online messages, UCC1 sent defendant HEINRICH screenshots of stolen data related to three merchants who used the Victim Company's services.

62. On or about August 26, 2020, via online messages, defendant HEINRICH asked UCC1 to provide sales data for a merchant who used the Victim Company's services.

63. On or about August 26, 2020, via online messages, UCC1 sent defendant HEINRICH a screenshot of stolen data relating to a merchant who used the Victim Company's services.

64. On or about August 26, 2020, via online messages, UCC1 asked defendant HEINRICH to provide UCC1 with three false positive reviews in exchange for the stolen data UCC1 had sent to defendant HEINRICH; defendant HEINRICH confirmed that he had provided two of the false positive reviews and that he would provide the third soon.

65. On or about August 27, 2020, via online messages, UCC1 asked defendant HEINRICH to provide UCC1 with two false positive reviews in exchange for the stolen data UCC1 had sent to defendant HEINRICH.

66. On or about August 27, 2020, via online messages, defendant HEINRICH told UCC1 that he provided one false positive review, but that he could not provide the second because he was not able to switch the IP address he was using to the correct location.

67. On or about September 2, 2020, via online messages, defendant HEINRICH asked UCC1 if UCC1 was still able to continue providing information to defendant HEINRICH or if doing so would be too risky.

68. On or about September 2, 2020, via online messages, UCC1 told defendant HEINRICH that UCC1 would find a way to continue providing information to defendant HEINRICH, assured defendant HEINRICH that UCC1 was "good in ninja moves," and sent defendant HEINRICH screenshots of stolen data.

69. On or about September 2, 2020, via online messages, defendant HEINRICH asked UCC1 if UCC1's employer would look at and record UCC1's screens; UCC1 replied that it would not.

70. On or about September 15, 2020, via online messages, defendant HEINRICH asked UCC1 to provide sales data for the previous day for a merchant who used the Victim Company's services.

71. On or about September 15, 2020, via online messages, UCC1 sent defendant HEINRICH a screenshot of stolen data relating to a merchant who used the Victim Company's services.

72. On or about September 16, 2020, via online messages, UCC1 asked defendant HEINRICH to provide UCC1 with a false positive review.

73. On or about September 23, 2020, via online messages, UCC1 told defendant HEINRICH that two employees of the Victim Company had been involved in a security breach of the Victim Company.

74. On or about September 25, 2020, via online messages, defendant HEINRICH instructed UCC1 to delete UCC1's online messaging account and sent UCC1 a link on how to permanently delete his messaging account; defendant HEINRICH said he would delete his messaging account as well and would contact UCC1 via Facebook.

75. On or about January 27, 2021, in Los Angeles, California, defendant HEINRICH possessed on a hard drive approximately 3,000 files containing stolen data related to merchants who used the Victim Company's services and their customers; the stolen data included merchants' and customers' names, customers' billing and shipping addresses, customers' email addresses, items the customers purchased from the merchants, and customers' payment methods.

COUNT TWO

[18 U.S.C. § 1028A(a)(1)]

Beginning on a date unknown and continuing until on or about January 27, 2021, in Orange County and Los Angeles County, within the Central District of California, and elsewhere, defendant TASSILO HEINRICH, also known as "Tass," "BigBoy," "BigBoy#1828," and "Pokeball" ("HEINRICH"), knowingly transferred, possessed, and used, without lawful authority, means of identification that defendant HEINRICH knew belonged to other persons during and in relation to the offense of Conspiracy to Commit Wire Fraud, a felony violation of Title 18, United States Code, Section 1349, as charged in Count One of this Indictment.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of defendant's conviction of the offense set forth in Count One of this Indictment.

2. Defendant, if so convicted, shall forfeit to the United States of America the following:

    (a) All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses; and

    (b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), defendant, if so convicted, shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. §§ 982 and 1028]

1.  Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Sections 982 and 1028 in the event of defendant's conviction of the offense set forth in Count Two of this Indictment.

2.  Defendant, if so convicted, shall forfeit to the United States of America the following:

   (a) All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense; and

   (b) Any personal property used or intended to be used to commit the offense; and

   (c) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b) and 1028(g), defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the

//

//

court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

         /S/
Foreperson

TRACY L. WILKISON
Acting United States Attorney

CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division

CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, Cyber & Intellectual
  Property Crimes Section

VICTORIA A. DEGTYAREVA
Assistant United States Attorney
Chief, Cyber & Intellectual
  Property Crimes Section